**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**CHERYL SCHULTZ,**

**Plaintiff,**

    **vs.**                                    **04-CV-1369**
                                                 **(NAM/RFT)**

**MICHAEL J. ASTRUE\*,**
**COMMISSIONER OF SOCIAL SECURITY,**

**Defendant.**

_____

**APPEARANCES:**                            **OF COUNSEL:**

Peter W. Hill, Esq.                      Peter W. Hill, Esq.
384 Main Street
PO Box 823
Oneonta, New York 13820
*Attorney for Plaintiff*

Glenn T. Suddaby                     William H. Pease, Esq.
United States Attorney for
the Northern District of New York
P.O. Box 7198-
100 South Clinton Street
Syracuse, New York 13261-7198
and
Office of General Counsel              Barbara L. Spivak, Esq.
Social Security Administration      Jennifer S. Rosa, Esq.
26 Federal Plaza
New York, New York 10278
*Attorneys for Defendant*

      \*\* On February 12, 2007, Michael J. Astrue was sworn in as Commissioner of the Social
Security Administration.  Pursuant to Federal Rule of Civil Procedure 25(d)(1), he is
automatically substituted for former Commissioner Joanne B. Barnhart as the defendant in this
action.

**Norman A. Mordue, Chief U.S. District Judge:**

**MEMORANDUM-DECISION AND ORDER**

## I.      INTRODUCTION

Plaintiff Cheryl Schultz brings the above-captioned action pursuant to 42 U.S.C. § 405(g) of the Social Security Act, seeking review of the Commissioner of Social Security's decision to deny her application for disability insurance benefits ("DIB").  Presently before the Court are the parties' motions for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure.

## II.     BACKGROUND

Plaintiff was born on February 12, 1965, and was 39 years old at the time of the administrative hearing on April 29, 2004. (Administrative Transcript at p. 254).[1]  Plaintiff is married and has 4 children. (T. 145).  She resides with her husband, her 2 youngest children (ages 13 and 3) and her brother in law.  (T. 255).   Plaintiff obtained her GED and completed a word processing course at the Utica School of Commerce. (T. 262).    Plaintiff was employed from November of 1994 until August of 2002 at Bonide Products, Inc. where she worked 5 days a week, 8 ½ hours a day.  (T. 53, 262).  She was a registration manager with job duties that included registering insecticides, pesticides and fertilizers; proofreading EPA labels; completing usage reports; and completing label orders.  (T. 53, 255-256).  Plaintiff worked at computers in a seated position but occasionally lifted 10 pound files. (T. 256).  Prior to working at Bonide, plaintiff was employed as a home health care aide.  (T. 256).  Her responsibilities included bathing, feeding and taking care of residents. (T. 256).  Occasionally, she would need to lift the residents. (T. 257).  The job required her to be on her feet "quite a bit".  (T. 257).    Plaintiff

---

[1]  Portions of the administrative transcript, Dkt. No. 4, filed by the Commissioner, will be cited herein as "(T._ _)."

claims she is disabled due to chronic pain and fibromyalgia.[2] (T. 12).  The last day that she

worked in any capacity was August 12, 2002.[3] (T. 256).

**A**.      **Plaintiff's Medical Treatment**

A review of the record indicates that plaintiff was treated for her alleged disabling

conditions by Dr. David Petrie, Dr. Martin Morrell, Dr. Charles Buscema, Dr. Donald Raddatz,

and Dr. Jonathan Block.[4]

David Petrie, M.D.

The first record of treatment with any doctor for the alleged disabling condition was in

August of 2002 with Dr. Petrie.[5]  Plaintiff complained of pain in her left arm, joints and hands,

but stated she would not "take the time to go to physical therapy". (T. 239).  Plaintiff exhibited

spasms with limited range of motion. (T. 239).  Dr. Petrie concluded that her symptoms were

musculoskeletal and concluded that she may suffer from arthritic complaints with muscle spasms.

(T. 239-240).   Dr. Petrie prescribed Soma and Celebrex and also suggested to plaintiff that she

---

[2]  Fibromyalgia is pain and stiffness in the muscles and joints that either is diffuse or has multiple trigger points.  *Dorland's Illustrated Medical Dictionary* 711 (31st ed. 2007).

[3]  The record is not clear on the issue of whether plaintiff was terminated or taken out of work by her doctors.  The treating physician records indicate that plaintiff was terminated by Bonide as she was not able to return to work. (T. 218).  However, during the hearing, plaintiff testified that she began experiencing problems with her back after the birth of her daughter and was under the care of doctors for a year before she was "taken out of work" by her doctors. (T. 262-263).

[4]  The record contains reports from Dr. Steven Z. Kussin (T. 91-92) and emergency room records from Faxton-St. Luke's Hospital and St. Elizabeth's Hospital. (T. 93-126). These records were not discussed by the ALJ in the decision.  Plaintiff makes no objection to the omission of these records from the discussion.  The Court has reviewed these records and finds they contain no evidence of treatment for the alleged disabling conditions.

[5]  The record indicates that plaintiff had been treating with Dr. Petrie for "quite a few months" and that she had an x-ray of her lower back that revealed minor degenerative changes. (T. 239-240).  However, these records and reports are not part of the record. The record does not indicate whether or not Dr. Petrie is a specialist.

may be depressed. [6]  (T. 240).  At her next visit, on August 22, 2002, plaintiff denied that she was

depressed.  Dr. Petrie noted that her Zung depression scale was negative. [7] (T. 238).   Although

plaintiff "looked like a fibromyalgia diagnosis", she did not have any actual trigger points.  (T.

238).  Dr. Petrie's report indicated that plaintiff did not want to go on working and wanted to be

out on family leave and disability until she obtained answers. (T. 238).  All lab work and other

objective testing was negative. (T. 238).

Plaintiff had 14 subsequent visits with Dr. Petrie from September of 2002 until December

of 2003.  During that time, Dr. Petrie continued to diagnose plaintiff with fibromyalgia and

depression.  (T. 235, 237).  On January 23, 2003, Dr. Petrie examined plaintiff and noted that she

ambulated without difficulty, walked around the room and was not in acute distress even though

she complained of terrible pain. (T. 230).   Dr. Petrie further noted that plaintiff was previously

injured in a car accident and had the same "exaggerated response" to that injury. (T. 231).

On February 19, 2003, Dr. Petrie concluded that plaintiff's "symptoms are way out of

proportion to her real physical examination". (T. 239).  Dr. Petrie sent plaintiff for an MRI of her

lumbar spine on February 13, 2003.  The study revealed minimal degenerative change of the

---

[6]  Soma is a centrally acting skeletal muscle relaxant, for the symptomatic management of acute, painful musculoskeletal disorders. *Dorland's Illustrated Medical Dictionary*, 301, 1759 (31st ed. 2007).  Celebrex is a nonsteroidal antiinflammatory drug used for symptomatic treatment of osteoarthritis and rheumatoid arthritis.  *Id*. at 317.

[7]  The Zung Self-Rating Depression Scale is a 20-item self-report questionnaire that is widely used as a screening tool, covering affective, psychological and somatic symptoms associated with depression. The questionnaire takes about 10 minutes to complete, and items are framed in terms of positive and negative statements. It can be effectively used in a variety of settings, including primary care, psychiatric, drug trials and various research situations.  The Zung scale cannot take the place of a comprehensive clinical interview for confirming a diagnosis of depression. World Health Organization, http://www.who.int/substance_abuse/research_tools/zungdepressionscale /en/index. html/ (last visited February 8, 2008).

lower dorsal segment with no significant compressive lesion.[8] (T. 201). During plaintiff's subsequent physical examinations from March of 2003 until December of 2003, Dr. Petrie indicated that plaintiff walked without difficulty, was able to get on and off the table, and had good range of motion in her neck, shoulders and extremities. (T. 208-227). Dr. Petrie noted that she "really doesn't show much of anything". (T. 208-226).

On June 20, 2003, Dr. Petrie was "reassured" that plaintiff was "seeing Dr. Busima [sic] who told her that a lot of it is caused by depression". (T. 220). Dr. Petrie advised plaintiff that she should continue with psychiatry. (T. 220). Throughout his reports and during the last noted examination, on December 16, 2003, Dr. Petrie repeatedly stated that depression was at the root of plaintiff's problems. (T. 210-216).

<u>Martin Morell, M.D.</u>

Dr. Petrie referred plaintiff to Dr. Morell, an arthritis specialist. Plaintiff first treated with Dr. Morell on September 9, 2002. (T. 83-84). Plaintiff complained of pain and stiffness in her hands and feet, fatigue and muscle/joint pain. (T. 83). Upon examination, plaintiff exhibited normal extension and flexion, normal range of motion in her neck, and normal and symmetrical strength. (T. 84). Dr. Morell diagnosed her with chronic pain and fibromyalgia with fatigue. (T. 84). Dr. Morell prescribed medication to help plaintiff sleep. (T. 84).

Plaintiff had 7 subsequent visits with Dr. Morell from September of 2002 until January of 2003. During that time, plaintiff continued to complain of body aches and severe fatigue. (T. 75-84). Dr. Morell prescribed a course of pain management with medications including Zoloft,

---

[8] The report references a prior study in 1998 but the record does not contain a report of that study.

Ambien, Trazodone and Zanaflex.[9]  (T. 79-84).  Dr. Morell suggested psychotherapy/counseling, acupuncture and aquatic therapy.[10] (T. 77, 80, 82).

On January 7, 2003, Dr. Morell referred plaintiff to Raymond A. Alessandrini, an occupational therapist associated with Sports Physical & Occupational Therapy PC of New York, for a comprehensive functional evaluation. (T. 195-200).  Alessandrini found that plaintiff could perform "light work" defined as "exerting up to 20 lbs. force occasionally, and/or up to 10 lbs. of force frequently, and/or negligible amount of force constantly to move objects". (T. 195).

Plaintiff's last visit with Dr. Morell was on January 17, 2003.  Dr. Morell explained the functional evaluation to plaintiff and noted that the "patient did not have the expected physiological response to reports of severe pain due to some observations of the examiner". (T. 75).

Charles Buscema, M.D.

Plaintiff began treating with Dr. Buscema, a psychiatrist, on February 19, 2003.  Plaintiff told Dr. Buscema that she had suicidal thoughts but did not act upon them as "her family needs her". (T. 143).  According to Dr. Buscema's notes, plaintiff claimed that she heard people talking to her including her deceased grandmother and complained of insomnia and a poor appetite with nausea. (T. 146).  Dr. Buscema concluded that plaintiff suffered from audio and visual hallucinations and diagnosed plaintiff with major depressive disorder with psychotic features. (T.

---

[9]  Ambien is used in the short-term treatment of insomnia. *Dorland's Illustrated Medical Dictionary* 58, 2120 (31st ed. 2007).   Zoloft is used to treat depressive, obsessive-compulsive, and panic disorders. *Id.* at 1724, 2120. Trazodone is an antidepressant used to treat major depressive episodes with or without prominent anxiety. *Id.* at 1983. Zanaflex is used as a short-acting agent to manage the increased muscle tone associated with spasticity, as that related to multiple sclerosis or spinal cord injury. *Id.* at 1958, 2119.

[10]  The record does not contain any reports or evidence that plaintiff received any aqua therapy, acupuncture, psychotherapy or counseling.

135, 146).  Dr. Buscema completed a form for the New York State Office of Temporary and
Disability Assistance.  (T. 135).  On that form, Dr. Buscema placed an "x" in a box in front of a
sentence that reads: "I cannot provide a medical opinion regarding this individual's ability to do
work-related activities". (T. 140).

Plaintiff next saw Dr. Buscema on March 21, 2003.  (T. 151).  Dr. Buscema noted that
plaintiff developed a number of somatic symptoms after her car accident in 1998. (T. 151).
According to Dr. Buscema, plaintiff did not have a history of psychiatric treatment but her brother
committed suicide and she had a history of sexual and physical abuse by her parents. (T. 151,
247).  During her examination, Dr. Buscema noted that plaintiff was alert, well groomed and
cooperative. (T. 151).  Dr. Buscema indicated that she was "uncomfortable acting", but had well
organized thoughts and did not exhibit any paranoia or hallucinatory behavior. (T. 151).  Dr.
Buscema again diagnosed plaintiff with major depressive disorder and prescribed antidepressants.
(T. 151).

The seven reports/notations that follow from Dr. Buscema are entitled "Pharm Manage".
(T. 248).  From March of 2003 until March of 2004, plaintiff advised Dr. Buscema that she was
having financial problems and that her family was not supportive.  (T. 247-248).  Dr. Buscema
continually opined that plaintiff was depressed and that she "wanted approval for social security
disability". (T. 244).   The last report from Dr. Buscema is dated March 4, 2004 and is entitled
"Psychopharmacological Management".  Dr. Buscema indicated that plaintiff was to continue her
medication and seek psychotherapy.[11]  (T. 243).

---

[11]  Again, there is no evidence that the plaintiff received psychotherapy.

<u>Donald Raddatz, M.D.</u>

Dr. Petrie referred plaintiff to Dr. Raddatz for a rheumatological evaluation.  Plaintiff's initial and only examination was on May 2, 2003.  (T. 202).  Plaintiff stated that her symptoms dated back to 2001 but the doctor noted that they could date back to 1998 when she had a motor vehicle accident. (T. 203).  Dr. Raddatz's report stated that plaintiff advised that she was prescribed Lortab and OxyContin for her pain.  (T. 203).  Upon examination, Dr. Raddatz noted that plaintiff's gait was normal, she had no weakness on strength testing, no spasms noted and good extension in the lumbar spine. (T. 205).  Dr. Raddatz noted that she had a weight gain of 30 pounds since 1999. (T. 205).  Dr. Raddatz opined that she "has a significant element of depression contributing to her symptoms as the predominant source of her symptoms with secondary fibromyalgia complaints". (T. 205).  Dr. Raddatz stated that if she can manage her depression, some of her musculoskeletal symptoms will relent. (T. 202).  According to Dr. Raddatz, the key element to her treatment was "psychiatric follow up/management".  (T. 206).

<u>Jonathan Block, M.D.</u>

Dr. Petrie referred plaintiff to Dr. Block for a urological consult which took place on October 7, 2003.  (T. 189).  Dr. Block diagnosed her with urinary incontinence and suggested a plethora of testing to rule out infection or malignancy. (T. 191).  Dr. Block completed a "Statement of Ability To Do Work-Related Activities (Physical)" for the plaintiff on December 26, 2003.  (T. 185).  Dr. Block further indicated that plaintiff had no limitations in her ability to lift/carry, stand/walk, sit, push or pull. (T. 185-186).  Dr. Block opined that plaintiff had no postural, manipulative, visual/communicative or environmental limitations. (T. 186-188).

**B.    Consultative Examinations**

Jamal Emad, M.D.

On April 2, 2003, Dr. Emad performed a psychiatric examination of plaintiff at the request of the New York State Department of Temporary and Disability Assistance. (T. 131-132). Dr. Emad noted no bizarre behavior and that plaintiff's thinking was clear. (T. 133). Dr. Emad reported that plaintiff had some anxiety with mood swings and problems sleeping, eating and with her weight. (T. 133). Dr. Emad diagnosed plaintiff with bipolar disorder and alcohol dependency (in remission), and suggested outpatient treatment with antidepressants and mood stabilizers. (T. 133.). Finally, Dr. Emad opined that plaintiff was capable of handling her own funds. (T. 133).

Mental Residual Functional Capacity Assessment ("Mental RFC")

The record contains a Mental RFC assessment completed by Dr. Abdul Hameed on April 16, 2003 at the request of the agency. Dr. Hameed noted that plaintiff's mental disorder did not significantly limit her ability to sustain a routine without supervision, work with others and make simple work-related decisions. (T. 153). Dr. Hameed opined that plaintiff was moderately limited in her ability to carry out detailed instructions, concentrate for extended periods of time, and to perform within a schedule or a normal work week without interruptions. (T. 153-154). Dr. Hameed further noted behavioral and physical changes associated with the use of regular substances. (T. 165). Finally, Dr. Hameed opined that plaintiff had no restriction of activities of daily living, mild difficulties in social functioning and moderate difficulties in concentration and pace as a result of her mental disorder. (T. 167).

Physical Residual Functional Capacity Assessment ("Physical RFC")

The record also contains a Physical RFC assessment completed by Karla Miller, a medical consultant, on April 17, 2003, at the request of the agency. (T. 173-178). After reviewing

plaintiff's records, Miller noted that plaintiff could lift/carry 20 pounds occasionally; lift/carry 10 pounds frequently; stand/walk for 6 hours in an 8 hour workday and; sit for about 6 hours in an 8 hour workday. (T. 174).  In addition, Miller stated that "on 1/17/03, Dr. Morrell opined that the claimant is not totally disabled and is able to perform light duties, this opinion is adopted".  (T. 177).

## III.  PROCEDURAL HISTORY

Plaintiff filed an application for Social Security disability insurance benefits ("DIB") on November 25, 2002.  (T. 40).  The application was denied on April 30, 2003.  (T. 28).  Plaintiff requested a hearing before an Administrative Law Judge ("ALJ") which was held on April 29, 2004. (T. 20).  On July 13, 2004, ALJ Kenneth R. Andrews issued a decision denying plaintiff's claim for disability benefits.  (T. 12-19).  The Appeals Council denied plaintiff's request for review on October 1, 2004, making the ALJ's decision the final determination of the Commissioner. (T. 4).  This action followed.

## IV.  ADMINISTRATIVE LAW JUDGE'S DECISION

The Social Security Act (the "Act") authorizes payment of disability insurance benefits to individuals with "disabilities."  The Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A). There is a five-step analysis for evaluating disability claims:

> "In essence, if the Commissioner determines (1) that the claimant is not working, (2) that he has a 'severe impairment,' (3) that the impairment is not one [listed in Appendix 1 of the regulations] that conclusively requires a determination of disability, and (4) that the claimant is not capable of continuing in his prior type of work, the

> Commissioner must find him disabled if (5) there is not another type of work the
> claimant can do." The claimant bears the burden of proof on the first four steps, while
> the Social Security Administration bears the burden on the last step.

*Green-Younger v. Barnhart*, 335 F.3d 99, 106 (2d Cir. 2003) (quoting *Draegert v. Barnhart*, 311
F.3d 468, 472 (2d Cir. 2002)); *Shaw v. Chater*, 221 F.3d 126, 132 (2d Cir. 2000) (internal
citations omitted).

In this case, the ALJ found at step one that plaintiff has not engaged in gainful activity
since the filing date of her application. (T. 13).  At step two, the ALJ concluded that plaintiff
suffered from fibromyalgia and depression which qualified as a "severe impairment" within the
meaning of the Social Security Regulations (the "Regulations").  (T. 14).  At the third step of the
analysis, the ALJ determined that plaintiff's impairments did not meet or equal the severity of any
impairment listed in Appendix 1 of the Regulations.  (T. 15).  At the fourth step, the ALJ found
that plaintiff had the following residual functional capacity ("RFC"):

> lift/carry at least 20 pounds; she could be expected to perform employment that does
> not require standing more than 30 minutes at a time; expected to perform
> employment that does not require sitting more than 60 minutes at a time; she could
> be expected to perform employment that is simple, routine and repetitive; she can be
> expected to perform employment that does not require more than a minimal level of
> concentration; she can be expected to perform at a slower pace. (T. 16).

Accordingly, the ALJ found that plaintiff could perform a wide range of light work but
concluded that she was unable to perform all of her past relevant work. (T. 16).  Since plaintiff
claimed that she suffered from exertional and non-exertional limitations, the ALJ obtained the
testimony of a vocational expert to determine whether there were jobs plaintiff could perform.
Based upon the vocational expert's testimony, the ALJ concluded at step five, that there are a
significant number of unskilled, sedentary jobs in the regional and national economy that plaintiff
could perform, such as work as a dispatcher. (T. 16).  Therefore, the ALJ concluded that plaintiff

was not under a disability as defined by the Social Security Act.  (T. 17).

## V.     DISCUSSION

A Commissioner's determination that a claimant is not disabled will be set aside when the factual findings are not supported by "substantial evidence."  42 U.S.C. § 405(g); *see also Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000).  Substantial evidence has been interpreted to mean "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.*  The Court may also set aside the Commissioner's decision when it is based upon legal error. *Rosa v. Callahan*, 168 F.3d 72, 77 (2d Cir. 1999).

Plaintiff argues that: (1) the RFC determination by the ALJ is not supported by substantial evidence; (2) the ALJ erred in evaluating plaintiff's credibility; and (3) the Commissioner did not sustain his burden of proof at the fifth step of the sequential evaluation process.

### A.     Residual Functional Capacity

Residual functional capacity is:

> "what an individual can still do despite his or her limitations . . . .  Ordinarily, RFC is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis, and the RFC assessment must include a discussion of the individual's abilities on that basis. A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule."

*Melville v. Apfel*, 198 F.3d 45, 52 (2d Cir. 1999) (quoting SSR 96-8p, Policy Interpretation Ruling Titles II and XVI: Assessing Residual Functional Capacity in Initial Claims ("SSR 96-8p"), 1996 WL 374184, at *2 (S.S.A. July 2, 1996)).  In making a residual functional capacity determination, the ALJ must consider a claimant's physical abilities, mental abilities, symptomology, including pain and other limitations which could interfere with work activities on a regular and continuing basis.  20 C.F.R. § 404.1545(a).

Pursuant to 20 C.F.R. § 404.1527(1), every medical opinion, regardless of its source, must be evaluated.  In determining how much weight to grant a medical opinion several factors are considered including:  (i) the frequency of examination and the length, nature, and extent of the treatment relationship; (ii) the evidence in support of the opinion, i.e. '[t]he more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight' that opinion is given; (iii) the opinion's consistency with the record as a whole; (iv) whether the opinion is from a specialist; if it is, it will be accorded greater weight; and (v) other relevant but unspecified factors.  *Schisler v. Sullivan*, 3 F.3d 563, 567 (2d Cir. 1993) (citing 20 C.F.R. § 404.1527(d)(1)(d)(6); 20 C.F.R. § 416.927(d)(2)).

## 1.      Physical Capabilities

Plaintiff argues that the RFC assessment is erroneously based upon the opinions of non-examining consultants whose names and qualifications cannot be discerned from the record. Further, plaintiff asserts that the ALJ failed to develop the record as he did not contact her treating physician to reconcile the alleged discrepancy between Dr. Morell's agreement with the FCE and his increase in plaintiff's pain medication.  (Dkt. No. 5, p. 16).

In this case, the ALJ concluded that plaintiff retained the residual functional capacity to lift/carry at least 20 pounds.  (T. 16).  Further, the ALJ found that plaintiff could not be expected to perform employment that "requires standing more than 30 minutes at a time" and "sitting more than 60 minutes at a time". (T. 16).  As support for this assessment, the ALJ cited to the Physical RFC Assessment completed by Karla Miller, a medical consultant.[12] (T. 16, 173).  In the Physical RFC Assessment, Miller noted that plaintiff is able to occasionally lift and/or carry 20 pounds;

---

[12] Plaintiff argues that the examiner's name is not discernable, however, a review of the record reveals that it was performed by Karla Miller. (T. 171).

frequently lift and/or carry 10 pounds; stand and/or walk 6 hours in an 8 hour workday; and sit for six hours in an 8 hour workday. (T. 174).  No other exertional limitations were noted. (T. 174-177).  Miller "adopted" the opinion of Dr. Morell that the "claimant is not totally disabled and is able to perform light duties". (T. 177).

The Court finds substantial evidence in the record to support the ALJ's conclusions.   As an initial matter, the Court agrees with plaintiff that the Physical RFC assessment by Karla Miller carries little weight and cannot constitute substantial evidence.  *Dejesus v. Barnhart*,  2007 WL 528895, at *7 (W.D.N.Y. 2007) (holding that the RFC form does not indicate that examiner is a physician, nor does it indicate any other title or qualifications, accordingly the Court does not believe that it is entitled to any weight); *Algarin v. Barnhart*, 2007 WL 528889, at *9 (W.D.N.Y. 2007).  However, in this case, the ALJ's determination regarding plaintiff's RFC is supported not only by the Physical RFC assessment, but by the objective medical evidence and medical records of plaintiff's treating physicians.  Thus, regardless of the findings of the consultant in the Physical RFC, substantial evidence exists in the record to support the ALJ's assessment of plaintiff's RFC as it relates to her physical abilities.

Dr. Petrie noted that although plaintiff complained of terrible pain, she did not appear in acute distress and had a history of "exaggerated response" to injury. (T. 230-231).  Dr. Petrie continually noted that her symptoms are "way out of proportion to her real examination" and her examinations "really doesn't show much of anything". (T. 208-226).  Dr. Petrie prescribed Lortab and a Duragesic patch to control her pain. (T. 14).  The report of Dr. Raddatz indicates a normal gait, no weakness on strength testing, no spasms and good extension.  (T. 205).  Dr. Block was the only doctor to provide an opinion on her ability to work and he found that she had no

limitations.  (T. 186-188).   Plaintiff's MRI revealed minimal degenerative changes and no

significant compressive lesions.  (T. 201).  In addition, all lab work and other objective testing by

Dr. Petrie and Dr. Raddatz was negative. (T. 202, 238).

More importantly, Dr. Morell provided an opinion regarding plaintiff's physical

capabilities.  A Functional Capabilities Evaluation (FCE), prepared at the request of Dr. Morell,

indicated that plaintiff is able to "exert up to 20 lbs of force occasionally", "10 lbs. frequently"

and is "able to sit for up to 60 minutes" and "stand for up to 30 minutes". (T.195).  Dr. Morell

noted that "patient did not have the expected physiological response to reports of severe pain due

to some observations of the examiner". (T. 75).  Dr. Morell concluded that plaintiff was not

totally disabled and was able to perform light duties. (T. 75)

As part of her argument, plaintiff alleges that the ALJ failed to fulfill his duty to develop

the record.[13]  Plaintiff infers that Dr. Morell could not have agreed with the conclusions of the

FCE as he increased plaintiff's pain medication. [14]  (Dkt. No. 5, p. 16).

It is well settled that, even when the claimant is represented by counsel, the ALJ has an

affirmative duty to develop the medical record and seek out further information where physician's

reports are inconsistent and where gaps exist in the record.  *See Rosa v. Callahan*, 168 F.3d 72, 79

(2d Cir. 1999) (sparse notes, incomplete record of medical visits, and brief, conclusory

---

[13]  Although this claim was asserted in "Point III" of Plaintiff's Memorandum within the context of plaintiff's "credibility" argument, it is more appropriately addressed in the context of the ALJ's analysis of plaintiff's RFC.  *See Nozan v. Commissioner of Social Sec.*, 2006 WL 2927170, *5 (E.D.N.Y. 2006) (holding that the ALJ's failure to develop a full and adequate record led to an improper application of the treating physician rule, which in turn affected the remaining steps of the analysis and the ALJ's ultimate finding of "no disability.").

[14]  Plaintiff also states that "if the ALJ honestly believ[ed] that Dr. Morell had actually administered the FCE (although he just reviewed the report) . . .". (Dkt. No. 5, p. 16).  The record clearly reflects that Dr. Morell did not administer the FCE rather, he referred the plaintiff to a therapist who conducted the analysis at the request of Dr. Morell. (T. 195).

assessments constitute gap in the medical record requiring ALJ development). However, where the ALJ possesses "a complete medical history," the ALJ is under no duty to seek additional information before rejecting a claim. *Rosa*, 168 F.3d at 79, n. 5 (citing *Perez v. Chater*, 77 F.3d 41, 48 (2d Cir.1996)). The ALJ does not need to attempt to obtain every extant record of the claimant's doctor visits when the information on the record is otherwise sufficient to make a determination, and need not request more detailed information from the treating physician if the physician's report is a sufficient basis on which to conclude that the claimant is not disabled. *Rosa*, 168 F.3d at 79.

In this case, the Court finds that the record does not support plaintiff's contention that the ALJ failed to obtain relevant medical information from Dr. Morell. The January 2003 report of Dr. Morell indicated that plaintiff was capable of performing "light duty". As discussed, the reports of Drs. Petrie, Raddatz, Block and Morell, as well as plaintiff's test records, provided the ALJ with substantial evidence to support Dr. Morell's assessment of plaintiff's condition. *See Peterson v. Barnhart*, 219 F.Supp.2d 491, 494 (S.D.N.Y. 2002) (holding that no inconsistencies exist as plaintiff's medical reports are complete and uncontradicted by similar reports during the disputed period). Thus, the ALJ had no obligation to obtain more detailed records from the treating physician and no obligation to attempt to supplement the existing record. *Infante v. Apfel*, 2001 WL 536930, at *6 (S.D.N.Y. 2001). The record lacks substantial evidence and plaintiff fails to cite to any portion of the record that would support the determination that Dr. Morell's increase in pain medication undermines his agreement with the FCE.

As a final note, plaintiff argues that the ALJ substituted his own medical opinion for that of her physicians stating that "the claimant's Lortab and Duragesic patch . . . provide adequate if

16

not superior control of this impairment". (T. 14). Even crediting plaintiff's argument, as the Court has found that substantial evidence exists to support the ALJ's RFC assessment with respect to plaintiff's physical limitations, this argument is without merit.

Based upon the above, the Court finds that substantial evidence exists to support the ALJ's conclusions and that plaintiff has the RFC to perform light work.

### 2.      Mental Health Impairments

Plaintiff argues that the ALJ failed to provide an adequate basis to support his assessment of her mental health impairments. Specifically, plaintiff asserts that the ALJ improperly rejected the opinion of the examining consultant, Dr. Emad. Further, plaintiff asserts that the exact basis for the determination regarding her mental health impairments cannot be ascertained as the ALJ engaged in selective "picking and choosing" of portions of the record to support his conclusions. (Dkt. No. 5, p. 11). The Commissioner argues that plaintiff bears the burden at step four of the analysis and that the Commissioners' RFC assessment is supported by substantial evidence. (Dkt. No. 6, p. 8).

In assessing opinions, a written report by a licensed physician who has examined plaintiff may constitute substantial evidence supportive of a finding by the hearing examiner. *Mongeur v. Heckler*, 722 F.2d 1033, 1039 (2d Cir. 1983); *see also Richardson v. Perales*, 402 U.S. 389, 402 (1971). However, opinions of non-examining sources are entitled to less weight than an examining consultative physician's opinion. *Pogozelski v. Barnhart*, 2004 WL 1146059, at *13 (E.D.N.Y. 2004) (holding that a non-examining source's opinion, including the opinions of state agency medical consultants and medical experts, be given less weight than an examining source's opinion). The general rule is that "the written reports of medical advisors who have not

personally examined the claimant deserve little weight in the overall evaluation of disability".

*Vargas v. Sullivan* 898 F.2d 293, 295-296 (2d Cir. 1990); *see also Havas v. Bowen,* 804 F.2d

783, 786 (2d Cir. 1986) (concluding that the opinions of non-examining medical personnel cannot

in themselves constitute substantial evidence overriding the opinions of examining physicians).

When an ALJ's decision is not fully favorable to a claimant, he must provide specific

reasons for the weight given to each treating source's medical opinion, supported by the evidence

in the case record, and must state the reasons for that weight.  *See* Social Security Ruling

("S.S.R.") 96-2p; *see also Richardson v. Barnhart*, 443 F.Supp.2d 411, 424 (W.D.N.Y. 2006)

(holding that even if the ALJ had properly discounted treating physician's medical opinion, he

would have still failed to properly explain the weight he gave to other physician opinions in the

record); *see also Lunan v. Apfel*, 2000 WL 287988, at *5 (N.D.N.Y. 2000) (holding that remand

was necessary because the ALJ did not discuss the weight that she assigned or the specific

reasons for assigning such weight to the opinions of the treating physicians, as she was required

to do pursuant to § 404.1527(d)(2)).

In this case, the ALJ discussed plaintiff's "mental health impairments" and found:

> ". . . no limitations in the area of activities of daily living.  The undersigned
> finds no more than mild functional limitations in the area of social
> functioning.  The undersigned finds no more than moderate functional
> limitations in the area of concentration, persistence and pace.  There is also
> no objective evidence of any repeated episodes of decompensation of
> extended duration from a mental health standpoint".  (T. 15).

The ALJ cited to the Mental RFC prepared by the non-examining medical consultant,

Dr. Abdul Hameed, as support for this conclusion. (T. 15).  The ALJ discussed plaintiff's non-

exertional limitations in the context of the RFC assessment.  Specifically, he concluded:

"The claimant cannot be expected to perform at employment that does not require that she perform more than simple, routine, repetitive work. The claimant can be expected to perform at employment that does not require more than a minimal level of concentration. The claimant can be expected to perform at a slower pace. Although further functional limitations were presented to the vocational expert and to the undersigned during the hearing, there is no further clinical evidence that would support any limitations beyond those previously described." (T. 16).

As support for this assessment, the ALJ cited to the entire medical record, Exhibits 1 through 19. (T. 16). While the ALJ adequately discussed the record, it is unclear what specific evidence the ALJ relied upon in determining the extent of plaintiff's mental health impairments. Moreover, the ALJ failed to explain or address the weight given to any of the medical opinions of treating or examining physicians and consultants. *See* S.S.R. 96-6p ("Administrative law judges . . . must explain the weight given to these opinions in their decision.").

In this case, the ALJ clearly relied upon the opinions of Dr. Hameed, a non-examining consultant, but inexplicably rejected the opinions of Dr. Emad, an examining consultant.[15]  It is clear that the ALJ should not have given Dr. Hameed's opinion more than limited weight. The ALJ offered no explanation or discussion regarding the weight afforded to any of the plaintiff's treating physicians including Drs. Petrie, Morell, Raddatz or Block all of whom discussed plaintiff's mental condition. Further, the ALJ failed to discuss the weight assigned to the opinions of Dr. Hameed and Dr. Emad.

The ALJ's failure to explain the weight he gave to the opinions in the record was legal error. In this case, the ALJ did not recite or apply any of the factors set forth at 20 C.F.R. § 404.1527(d)(2) in evaluating each opinion. Without the benefit of such analysis, it is impossible to determine whether the ALJ's decision is supported by substantial evidence.

---

[15] Dr. Emad examined plaintiff but did not complete a functional evaluation.

Additionally, plaintiff argues that the ALJ substituted his own medical opinion for that of the physicians. (Dkt. No. 5, p. 17).  Plaintiff takes issue with the ALJ's conclusions regarding her medications for treatment of depression.  With respect to plaintiff's depression, the ALJ found that "claimant's Paxil and Vistaril medications provide adequate, although likely superior control of this impairment".  (T. 14).

An ALJ may not arbitrarily substitute his own judgment for a competent medical opinion. *Rosa v. Callahan*, 168 F.3d 72, 79 (2d Cir.1999) (holding that as a "lay person[ ]," the ALJ simply was not in a position to know whether the absence of muscle spasms would in fact preclude the disabling loss of motion described by the physician); *see also McBrayer v. Secretary of Health and Human Servs*., 712 F.2d 795, 799 (2d Cir. 1983) (holding that while an [ALJ] is free to resolve issues of credibility as to lay testimony or to choose between properly submitted medical opinions, he is not free to set his own expertise against that of a physician who [submitted an opinion to or] testified before him); *see also Balsamo v. Chater*, 142 F.3d 75, 81 (2d Cir. 1998) (concluding that in the while an [ALJ] is free to resolve issues of credibility as to lay testimony or to choose between properly submitted medical opinions, he is not free to set his own expertise against that of a physician who [submitted an opinion to or] testified before him).

In this case, Dr. Raddatz opined that plaintiff had a "significant element of depression" and Dr. Petrie's notes contain numerous references to the fact that plaintiff suffers from depression.  (T. 205, 210-216, 220, 235, 237, 240).   The ALJ noted that plaintiff is being "treated for her depression" by Dr. Buscema, but did not discuss Dr. Buscema's opinions or treatment, only noting that she was "only seen several weeks apart".  (T. 14).  The ALJ acknowledged Dr. Buscema prescribed Paxil and Vistaril for her depression, however, the ALJ

concluded that "it appears that the claimant's Paxil and Vistaril provide adequate, although likely, superior control of this impairment". (T. 14).

Here, the ALJ stated, without citing to any medical opinion, that plaintiff's medications "provide adequate, although likely, if not superior control of this impairment". (T. 14).   In this finding, the ALJ plainly substituted his own expertise in place of physicians who submitted opinions.  Thus, the Court finds that the record lacks substantial evidence to support the ALJ's conclusion regarding plaintiff's mental health impairments and non-exertional limitations and consequently, her residual functional capacity to perform light work.  Accordingly, the Court finds that the decision must be remanded.  On remand, the assigned ALJ shall re-examine the evidence as to plaintiff's mental impairments consistent with this Order.

**B.    Credibility**

Plaintiff argues that the ALJ applied an incorrect legal standard and erroneously determined that plaintiff's statements regarding her impairments were not entirely credible. Plaintiff claims that the ALJ improperly found that "objective medical evidence" was required to support her complaints of pain.  (Dkt. No. 5, p. 12-19).  Further, plaintiff claims that the ALJ should have considered plaintiff's "good work record" as a factor in assessing her credibility .[16] (Dkt. No. 5, p. 19).  Defendant contends that there is substantial evidence to support the ALJ's decision to discredit plaintiff's complaints of pain, and that the ALJ followed the correct legal standard. (Dkt. No. 6, p. 12).

---

[16]   In Plaintiff's Brief, she argues two additional issues in the context of the credibility analysis: (1) the issue of the ALJ's failure to adequately develop the record; and (2) the ALJ's improper substitution of his own medical opinion for that of the physicians. (Dkt. No. 5, p. 16-18).  These issues were discussed *infra* as the objections were relevant in the context of the plaintiff's RFC.  The discussions will not be repeated herein.

It is well settled that "a claimant's subjective evidence of pain is entitled to great weight where . . . it is supported by objective medical evidence".  *Simmons v. U.S. R.R. Retirement Bd.*, 982 F.2d 49, 56 (2d Cir. 1992) (citations omitted).  "Objective medical evidence is evidence obtained from the application of medically acceptable clinical and laboratory diagnostic techniques, such as evidence of reduced joint motion, muscle spasm, sensory deficit or motor disruption." *Casino-Ortiz v. Astrue*, 2007 WL 2745704, at *11, n. 21 (S.D.N.Y. 2007) (citing 20 C.F.R. § 404.1529(c)(2)) .  The ALJ retains discretion to assess the credibility of a claimant's testimony regarding disabling pain and "to arrive at an independent judgment, in light of medical findings and other evidence, regarding the true extent of the pain alleged by the claimant." *Marcus v. Califano*, 615 F.2d 23, 27 (2d Cir. 1979); *Snell v. Apfel*, 177 F.3d 128, 135 (2d Cir. 1999) (holding that an ALJ is in a better position to decide credibility).

If plaintiff's testimony concerning the intensity, persistence or functional limitations associated with her pain is not fully supported by clinical evidence, the ALJ must consider additional factors in order to assess that testimony, including: 1) daily activities; 2) location, duration, frequency and intensity of any symptoms; 3) precipitating and aggravating factors; 4) type, dosage, effectiveness and side effects of any medications taken; 5) other treatment received; and 6) other measures taken to relieve symptoms.  20 C.F.R. §§ 404.1529(c)(3)(i)-(vi), 416.929(c)(3)(i)-(vi).  The issue is not whether the clinical and objective findings are consistent with an inability to perform all substantial activity, but whether plaintiff's statements about the intensity, persistence, or functionally limiting effects of her neck and back pain are consistent with the objective medical and other evidence.  *See* Social Security Ruling 96-7p, 1996 WL 374186, at *2.

22

After considering plaintiff's subjective testimony, the objective medical evidence, and any other factors deemed relevant, the ALJ may accept or reject claimant's subjective testimony. *Martone v. Apfel*, 70 F. Supp.2d 145, 151 (N.D.N.Y. 1999); *see also* 20 C.F.R. §§ 404.1529(c)(4), 416.929(c)(4). An ALJ rejecting subjective testimony must do so explicitly and with specificity to enable the Court to decide whether there are legitimate reasons for the ALJ's disbelief and whether his decision is supported by substantial evidence. *Melchior v. Apfel*, 15 F.Supp.2d 215, 220 (N.D.N.Y. 1998) (quoting *Brandon v. Bowen*, 666 F.Supp 604, 608 (S.D.N.Y. 1987)) (citations omitted). It is insufficient for an ALJ to make a conclusory statement that "the individual's allegations have been considered" or that "the allegations are (or are not) credible". Social Security Ruling ("SSR") 96-7p, 1996 WL 374186, at *4 (SSA July 2, 1996). Absent such findings, a remand is required. *Miller v. Shalala*, 894 F. Supp. 73, 75 (N.D.N.Y. 1995); *see also Knapp v. Apfel*, 11 F. Supp. 2d 235, 238 (N.D.N.Y. 1998) ("a finding that the Commissioner has failed to specify the basis for his conclusions is [a] compelling cause for remand").

In this case, the ALJ specifically addressed plaintiff's credibility and determined:

> "The undersigned has carefully considered all of the medical opinions in the record in addition to the testimony deduced at the hearing, regarding the severity of the claimant's impairments. The claimant's statements concerning her impairments and their impact upon her ability to work are found to be not entirely credible because the evidentiary objective medical evidence does not reflect incapacitating symptoms that were described by the claimant, in addition to the inconsistencies point out above. The lack of support for the claimant's subjective complaints and functional limitations is not due to any unexplained mental impairment but to the claimant's exaggeration of complaints." (T. 15-16).

The ALJ discussed plaintiff's testimony and found that:

> "Despite allegations of total disability raised during hearing testimony, the claimant is able to drive, care for a young child (three years old), maintain a marriage, and walk without difficulty". (T. 14).

23

Having reviewed the Administrative Transcript in its entirety, the Court finds that the ALJ did not apply the correct legal standard in assessing plaintiff's credibility.  The ALJ stated that "the evidentiary objective evidence does not reflect incapacitating symptoms that were described by the claimant"  (T. 15). This statement does not explain the basis for the ALJ's credibility determination under 20 C.F.R. § 404.1529 or Social Security Ruling 96-7p.

The ALJ was required to, consider the factors enumerated in 29 C.F.R. 404.1529(c)(3)(i)-(iv).  It is unclear from the record whether or not the ALJ properly considered these factors.  In support of the conclusion that plaintiff was not credible, the ALJ provided a one sentence summary of plaintiff's testimony regarding her daily activities.  The ALJ stated that ". . . the claimant is able to drive, care for a young child (three years old), maintain a marriage, and walk without difficulty. (T. 14).  During the hearing, plaintiff testified that she drove "20 miles a week, maybe, for doctors appointments" and other than that, "I don't go anywhere". (T. 258).  She testified that she has a 3 year old daughter and testified that her mother-in-law and daughters come to her home to help her during the day.  (T. 257-258).   With respect to her daily activities, plaintiff testified that she does not go to church or to the store. (T. 258, 270).  She testified that she does not perform household chores including sweeping, mopping, vacuuming or laundry. (T. 258).  She stated that she does not visit with friends, has no hobbies and leaves home only for doctor's appointments. (T. 258-259).  With respect to her personal hygiene, she testified that cannot take a bath and occasionally needs assistance from her family to take care of her personal needs. (T. 271).

The ALJ did not discuss this testimony nor did he explain why or how the portions of the testimony cited rendered plaintiff "not credible".  Consequently, the Court is left with no basis upon which to determine whether the appropriate legal standards were applied, nor can it evaluate whether the ALJ considered the entire evidentiary record in arriving at his conclusion. *See Harrison v. Secretary of Health and Human Services*, 901 F. Supp. 749, 757 (S.D.N.Y. 1995).  As a result, the Court remands this case for a determination of plaintiff's credibility which must contain specific findings based upon substantial evidence in a manner that enables effective review.

Finally, plaintiff alleges that her "good work record" entitles her to substantial credibility. (Dkt. No. 5, p. 19).  A claimant with a good work record is entitled to substantial credibility when claiming an inability to work because of a disability".  *Rivera v. Schweiker*, 717 F.2d 719, 725 (2d Cir. 1983) (citing *Singletary v. Secretary of Health, Educ. and Welfare*, 623 F.2d 217, 219 (2d Cir.1980)).  While "[a] claimant with a good work record is entitled to substantial credibility when claiming an inability to work ... [w]ork history [ ] is but one of many factors to be utilized by the ALJ in determining credibility." *Marine v. Barnhart*, 2003 WL 22434094, at *4 (S.D.N.Y. 2003).

In the matter at hand, plaintiff's history does not warrant an inference of credibility. *See Singletary*, 623 F.2d at 219 (holding that plaintiff's life history of hard labor performed under demanding conditions over long hours and employment at nationally known racing stables with valuable animals justifies the inference).  Plaintiff provided a work history from 1986 through 2002.  (T. 44).  However, she did not work continuously during that time.  (T. 44).  The work

history does not rise to any level which would require the ALJ to afford plaintiff additional "substantial credibility". (T. 44-50, 53).

## C.      Vocational Expert

The ALJ concluded that plaintiff had the residual functional capacity to perform a wide range of light work.[17] (T. 16).  However, plaintiff presented additional functional limitations that narrowed the scope of work she could be expected to perform.  (T. 17). Therefore, the ALJ enlisted the services of a vocational expert to determine whether there were jobs plaintiff could perform despite these limitations. *Bapp v. Bowen*, 802 F.2d 601, 606 (2d Cir. 1986) (where the claimant's range of work is significantly diminished by a non-exertional impairment, the Commissioner must adduce vocational expert testimony showing that the claimant can still perform a significant number of jobs available in the national economy); 20 C.F.R. §§ 404.1566(e), 416.966(e).

During the hearing, the ALJ posed a series of hypothetical questions to the vocational expert in order to ascertain whether there were any jobs plaintiff could perform despite her limitations. (T. 272).   Plaintiff argues that the responses are unreliable because the ALJ failed to provide all of plaintiff's limitations in the presentation of hypotheticals to the vocational expert. (Dkt. No. 5, p, 8).  In response to the hypotheticals, the ALJ identified work as a dispatcher with

---

[17]   The regulations define light work as follows:

Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

20 C.F.R. § 404.1567(b).

120 positions available in the region where plaintiff lives and 180,000 within the national economy. (T. 276). Plaintiff argues that 120 positions in the region where plaintiff lives is not a "significant number" sufficient to sustain the Commissioner's step-five burden. (Dkt. No. 5, p. 8).

As discussed *infra*, the ALJ's determination regarding plaintiff's RFC and possible non-exertional limitations (mental health impairments) is flawed. Thus, the Court refrains from analyzing this issue and retains jurisdiction to resolve this matter pending the aforementioned analysis by the ALJ regarding plaintiff's RFC.

## VI.    CONCLUSION

Based upon the foregoing, it is hereby

**ORDERED** that the decision denying disability benefits is **REVERSED** and this matter be **REMANDED** to the Commissioner, pursuant to 42 § U.S.C. 405(g) to reassess the treating physician's opinions concerning plaintiff's RFC;  reassess plaintiff's residual functional capacity; to assess plaintiff's credibility consistent with 20 C.F.R. § 404.1529 and Social Security Ruling 96-7; and for further proceedings consistent with this Order.

**IT IS SO ORDERED.**

Dated: March 18, 2008
       Syracuse, New York

                                    Norman A. Mordue
                                    Chief United States District Court Judge